UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:  MARK WADE LINDROS
_____/

UNITED STATES OF AMERICA,
INTERNAL REVENUE SERVICE,

    Appellant,

v.                                            CASE NO. 8:11-cv-2804-T-23

MARK WADE LINDROS,

    Appellee.
_____/

**ORDER**

       The United States appeals from an order of the bankruptcy court allowing the discharge under 11 U.S.C. § 523(a)(1)(C) of Mark Wade Lindros's 2000 tax liability. The appeal questions whether the bankruptcy judge correctly understood and applied Section 523(a)(1)(C), which states in pertinent part that a discharge in bankruptcy "does not discharge an individual debtor from any debt . . . for a tax . . . with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax . . . ."  The district court reviews the bankruptcy judge's findings of fact for clear error and reviews the conclusions of law *de novo*.

A careful review of the bankruptcy judge's findings of fact and conclusions of law reveals that the bankruptcy judge states with precision his reasons for allowing the discharge. First, the bankruptcy judge finds that "Lindros incurred a significant tax liability resulting from the substantial gains in the stock market that were treated as ordinary income" and finds further that Lindros "failed to pay his 2000 tax liability because he believed it could be offset by capital losses in later years. He was wrong." Ample evidence supports the bankruptcy judge's conclusion that Lindros's initial failure to pay his 2000 taxes was not a willful act of evasion but a mistaken belief that capital losses would offset – and eliminate the need to pay – the tax liability. A mistaken belief is not a willful evasion.

Second, the bankruptcy judge finds that, by the time Lindros became aware that the capital losses would not offset the 2000 tax liability, Lindros "had lost all of his wealth in the stock market crash and he ended up filing for bankruptcy two years later." Ample evidence supports the bankruptcy judge's conclusion (1) that Lindros honestly believed that with capital losses (which Lindros incurred in abundance) he could eliminate the 2000 tax liability and (2) that, by the time he realized the error of his belief and the necessity to pay the 2000 tax liability, Lindros had lost the ability to pay the 2000 tax liability. A *bona fide* belief that there is no need to pay (because the liability will disappear) is not a willful evasion. Similarly, the inability to pay, once aware of the need to pay, is not a willful evasion.

Third, the bankruptcy judge finds that, at the time Lindros "realized he would have difficulty paying his 2000 tax liability[,] . . . Lindros paid $50,000 to the State of New Jersey under an amnesty plan, and then in late 2002, he initiated contact with the IRS's Automated Collection System ('ACS')." The bankruptcy judge finds that, although Lindros provided the ACS agent the requested information and although Lindros's talks with the ACS were in progress, the ACS agent levied Lindros's bank accounts and wages for two years. Ample evidence supports the bankruptcy judge's finding that after Lindros realized both his need to pay the taxes and his inability to pay the taxes, Lindros reported to the ACS in an effort to arrange a payment plan. Paying a delinquent state tax in exchange for amnesty is not a willful evasion. Contacting the IRS's ACS and negotiating is not a willful evasion.

Fourth, the bankruptcy judge pointedly finds the reason for Lindros's 2004 bankruptcy:

> The bankruptcy filing was a direct result of the parties' failure to reach an agreement as to an amount for an installment payment agreement and the levies served on Lindros' wages, various bank accounts, and various stock brokerage accounts in late July 2004. [The ACS agent] had also threatened to levy upon Lindros' remaining [incentive stock option] stocks and pension funds . . .

A *bona fide* resort to bankruptcy is not a willful evasion.

Fifth, the bankruptcy judge finds that, after moving to Belize for legitimate (even if, perhaps, unwise or ill-informed) reasons (including a belief in the availability of an $80,000 tax exclusion and a reduced cost of living), Lindros received a

- 3 -

Chapter 7 discharge on November 29, 2004, a discharge that Lindros understood to extinguish his 2000 tax liability and to leave only a smaller liability for 2001 (the 2001 liability was excepted from the discharge). However, the IRS continued the effort to collect Lindros's 2000 tax liability. In response, Lindros initiated an adversary proceeding. Initiating and prevailing in an adversary proceeding and receiving a discharge for tax liability is not a willful evasion.

The bankruptcy judge correctly states that the IRS "bears the burden of proving by a preponderance of the evidence that . . . (i) Lindros engaged in evasive conduct (ii) with a mental state consistent with willfulness." The bankruptcy judge correctly elaborates the IRS's burden by stating that to satisfy the conduct component of the IRS's burden the IRS "must prove that Lindros engaged in affirmative acts to avoid the payment or collection of taxes" and that "mere non-payment of taxes, without more, is not enough." The bankruptcy judge required "affirmative acts of culpable omission or acts of commission . . . ."

The bankruptcy judge states with orderly precision exactly why he finds as a matter of fact that the conduct component of the IRS's burden remains unsatisfied:

> Lindros in this case did not transfer any property for little or no consideration or otherwise attempt to hide his assets. Nor did Lindros use his income to finance an extravagant lifestyle rather than pay his delinquent taxes. To be sure, Lindros lived an expensive lifestyle between 1999 and 2001: he owned or leased several vehicles, including a Ford Expedition, a Nissan Xterra, a Porsche, and a Yamaha motorcycle. He also put down a deposit on a Ferrari. In addition, Lindros (i) owned two homes at one time; (ii) spent $2,250 on flying lessons, $3,000 on elective eye surgery, $5,000 on cycling

> equipment, $2,000 on a kayak, $4,500 on a pool table, and $6,000 on a game room; and (iii) enjoyed several nice vacations.
>
> But those expenses are not extravagant considering Lindros' income at the time and his belief that his stock options were worth millions. Lindros was not living a luxurious lifestyle. In any event, the bulk of those expenses came before he received his 2000 tax assessment. More importantly, there is no evidence that Lindros maintained these expenses after he learned of his 2000 tax delinquency and the value of his stocks collapsed. In fact, he canceled his Ferrari order in early 2001 because he was losing substantial sums in the stock market. He also sold his New Jersey home in late 2001 and sold the Nissan Xterra back to the dealership sometime in 2001.

(Doc. 2, Att. 17 at 9).

Next, the bankruptcy judge correctly elaborates the IRS's burden by stating that, to satisfy the willfulness component of the IRS's burden of proof, the IRS must prove that Lindros "'voluntarily, consciously or knowingly, and intentionally' attempted to evade his tax liability." The bankruptcy judge required that, to prove the willfulness component, the IRS must prove that Lindros "(i) had a duty under the law, (ii) knew he had that duty; and (iii) voluntarily and intentionally violated that duty." Once again, with orderly precision, the bankruptcy judge states exactly why he finds as a matter of fact that the IRS fails to satisfy the willfulness component of the IRS's burden of proof:

> The Court finds that the Government fails to establish that the Debtor voluntarily and intentionally violated his duty—principally for four reasons. First, the Court finds credible Lindros' testimony that he would be able to offset his 2000 tax liability with capital losses from later years and that he increased his W-4 exemptions because of increased itemized deductions. In particular, the Court notes that Lindros . . . did not attempt to evade the questions on cross-examination and appeared to testify truthfully. Second, he did not

> continue maintaining his expensive lifestyle after he learned that he
> was unable to offset his 2000 tax liability with his capital losses from
> later years. Third, he initiated contact with the IRS in 2002 and
> attempted to work with the IRS to resolve his tax delinquency.
> Fourth, Lindros believed his 2000 tax delinquency was discharged in
> 2004. Based on those facts, the Court concludes the Government
> failed to prove that Lindros voluntarily and intentionally violated his
> duty to pay his 2000 taxes.

(Doc. 2, Att. 17 at 11).

In stating the applicable standard under Section 523(a)(1)(C) and applying the applicable standard to the facts in the record, the bankruptcy judge cites and relies on the Eleventh Circuit's governing precedent, including *United States v. Jacobs*, 490 F.3d 913 (11th Cir. 2007); *United States v. Fretz*, 244 F.3d 1323 (11th Cir. 2001); *Griffith v. United States*, 206 F.3d 1389 (11th Cir. 2000); and *Haas v. Internal Revenue Service*, 48 F.3d 1153 (11th Cir. 1995). *United States v. Mitchell*, 633 F.3d 1319 (11th Cir. 2011), although not cited by the bankruptcy judge, accords fully with *Jacobs* and the earlier precedent. The most recent pronouncement from the Eleventh Circuit on the standard under Section 523(a)(1)(C), *Mitchell* clarifies and confirms that Section 523(a)(1)(C) requires proof of more than "mere non-payment" and "inadvertent mistakes"; Section 523(a)(1)(C) requires "affirmative acts to avoid payment" and "knowledge and deliberateness" in effecting an "evasion" (something more than a mere non-payment) of taxes. 633 F.3d at 1328. Viewed from a somewhat different vantage, *Mitchell* confirms – as earlier cases had established – that, on the one hand, more than mere non-payment is required but, on the other hand, an act of fraud is

not required; the boundary for a Section 523(a)(1)(C) discharge lies somewhere between mere non-payment and active fraud.

The bankruptcy judge found the facts, all of which are supported in the record; the bankruptcy judge ascertained and applied the correct legal standard and found no willful evasion of taxes; and the bankruptcy judge granted Lindros a discharge of his 2000 tax liability.  Challenging the bankruptcy judge's order, the United States asserts that "a showing of willfulness requires only that the conduct be voluntary, conscious, and intentional."  (Doc. 7 at 14).  More directly, the IRS asserts that "Section 523(a)(1)(C) is satisfied by any intentional conduct."  (Doc. 7 at 15).  In that sentence lies a decisive difference between the IRS, on the one hand, and Lindros and the bankruptcy judge (and the statute), on the other hand.

The IRS's formulation that "a showing of willfulness requires only that the conduct be voluntary, conscious, and intentional" and that "Section 523(a)(1)(C) is satisfied by any intentional act" is either right or wrong depending on the answer to the question "intending what?"  In accord with Section 523(a)(1)(C) and Eleventh Circuit precedent, the correct answer to the question "intending what" is "intending a willful evasion of taxes," which is an act undertaken for the purpose of effecting the non-payment of taxes and not undertaken for some other purpose.  The IRS aspires to reduce the standard under Section 523(a)(1)(C) from "an act intended to evade" or "a willful evasion" down to the minimalist standard of "any intentional act that results in non-payment even if not intended to result in non-payment."

Whether in the statute or in the cases, terms such as "intentional" (intended what?), "deliberate" (deliberately did what?), "knowing" (knew what?), and the like only incompletely capture and convey the applicable standard and only incompletely ensure the consistent and sound management of the "willful evasion" standard under Section 523(a)(1)(C). Despite the frailties of the several terms, the *mens rea* requirement of the statute is clear: to prove a willful evasion of taxes the IRS must prove that at some time the taxpayer knew that taxes were due, knew of available resources with which to pay the taxes, and – with the objective of non-payment of taxes – elected to otherwise use (divest or secrete or squander) the resources at a time and in a manner that the taxpayer recognized would cause the taxes to remain unpaid.

An example might help identify an important distinction. Suppose a taxpayer knows of the necessity for payment at the end of the year of $50,000 in taxes. The taxpayer has $100,000 in cash. However, the taxpayer lends a good and solvent friend $50,000 and receives a promissory note payable at the end of the year – just before the taxes are due. Confident that he can pay his taxes with the $50,000 due from his friend and confident that his friend is good for the money, the taxpayer seizes an opportunity and buys for $50,000 a boat worth much more but owned by someone in financial distress. The good friend unexpectedly defaults on the promissory note. As a result of severe damage, the boat becomes nearly valueless. The taxpayer fails to pay his taxes.

- 8 -

The taxpayer in the example committed intentional acts (money lending and boat buying) that eventually caused the unavailability of money with which he otherwise could have paid his taxes. However, the taxpayer maintained a *bona fide* belief in the availability of $50,000 with which to pay taxes, which he intended to pay. At the time he lent the $50,000 and bought the boat, the taxpayer intended to pay – not evade – his taxes. Apparently, the IRS would contend that the intentional acts of money lending and boat buying, even if repayment is honestly expected and even if the payment – not the evasion – of taxes is intended, establish the "willful evasion" required by Section 523(a)(1)(C). But neither the statute nor the cases support the IRS's contention because in the example (and in the present instance) the taxpayer never committed a willful evasion.

The bankruptcy judge correctly apprehended the need to distinguish a mere "intentional act" from a culpable and "willful evasion." During a two-day trial the bankruptcy judge to that end received and evaluated evidence, including Lindros's testimony about his intent in several instances about which the IRS complains and on which the IRS relies in attempting to overturn the bankruptcy judge's allowing discharge. The bankruptcy judge noted that the case was "close" and ultimately depended on an assessment of Landros's "credibility," which the bankruptcy judge assayed from his unique and reliable vantage.

For reasons that puzzle the disinterested observer, the IRS attacks the bankruptcy judge's mentioning "credibility." The bankruptcy judge merely iterated

the obvious with his reference to "credibility;" the bankruptcy judge, along with every other finder of fact, determines "credibility" as a primary means of determining the facts.  In this instance, the bankruptcy judge, in order to measure Lindros's intent, carefully considered Lindros's explanation of his course of conduct during the pertinent time.  The bankruptcy judge asked, "Did Lindros intend to pay, or did he intend to evade, his taxes?  Was this an episode of mere non-payment or was this a culpable course of willful evasion?"  In fact, the bankruptcy judge accomplished exactly the end prescribed by the leading treatise on bankruptcy:

> Only rarely will it be difficult for the government to prove the first two elements of this test for willfulness.  To prevail on a section 523(a)(1)(C) dischargeability determination, a debtor needs to provide an explanation that some type of circumstance, for which the debtor should not be held responsible, caused him to fail to file the required returns. . . .  Courts should carefully evaluate the debtor's explanation for the late tax return filing and failure to pay the taxes due.  By doing so, courts will avoid making all tax debts for late filing of tax returns non-dischargeable and will not cause section 523(a)(1)(C) to override section 523(a)(1)(B).

4 Alan N. Resnick and Henry J. Sommer, *Collier on Bankruptcy* ¶ 523.07[4].

The IRS lists (Doc. 7 at 13 and 20-24) reasons for claiming that Lindros willfully evaded taxes.  The bankruptcy judge considered each explanation offered by Lindros, accepted Lindros's credibility (but not his wisdom) in each instance, and found as a matter of fact the absence of willful evasion.  Each finding is based upon ample evidence in the record.  The bankruptcy judge never commended Lindros for astute management of his affairs; the bankruptcy judge concluded that, on balance,

the IRS failed to meet the burden of proving by a preponderance of the evidence that Lindros's failing to pay his 2000 taxes was an act of willful evasion rather than the result of bad fortune, mismanagement, or the like.

## **CONCLUSION**

The IRS summarizes the events on which the IRS primarily depends in claiming that the bankruptcy judge erred in discharging Lindros's 2000 tax liability:

> Lindros engaged in affirmative acts to avoid payment and collection of his tax liability for 2000 by (1) altering his W-4 to reduce the amount withheld by the IRS based on his own mathematical calculation; (2) making no voluntary tax payments despite earning over $2 million from 1999 through 2008; (3) using his considerable resources to fund a lavish lifestyle to the detriment of the public fisc; and (4) moving to Belize to prevent the IRS from levying his accounts.

(Doc. 7 at 11)

Later, the IRS summarizes the bankruptcy judge's factual findings:

> The bankruptcy court made several findings in that regard: (1) Lindros believed he would be able to offset his 2000 tax liability with capital losses from later years; (2) Lindros increased his W-4 exemptions because of increased itemized deductions; (3) he initiated contact with the IRS in 2002 and attempted to work with the IRS to resolve his tax delinquency; (4) he moved to Belize to reduce his future tax liabilities; and (5) Lindros believed the 2000 tax delinquency was discharged in 2004.

(Doc. 7 at 20)

Comparing these two paragraphs reveals that another important difference (aside from divergent views of the applicable standard of "willful evasion") divides the IRS and the bankruptcy judge in this action. The bankruptcy judge, as the finder

- 11 -

of fact, credited Lindros's testimony in explanation of his non-payment, but the IRS continues in argument to reject Lindros's testimony, as if a finding of fact had not occurred. Although he found the issue "close," the bankruptcy judge accepted Lindros's credibility, a determination that is not clearly erroneous.[*] The vantage from which the bankruptcy judge observed and assessed Lindros's testimony offers a singular opportunity to determine credibility. Although neither this bankruptcy judge nor others often accept a taxpayer's explanation for a series of events resulting in a large non-payment of taxes, on this occasion the bankruptcy judge observed the debtor, considered the totality of the circumstances, and discharged the debt.

The decision of the bankruptcy judge is **AFFIRMED**. The Clerk is directed (1) to enter judgment for Mark Wade Lindros and against the United States of America, Internal Revenue Service, and (2) to close the case.

ORDERED in Tampa, Florida, on December 3, 2012.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[*] At the October 13, 2011, hearing on Lindros's claim for attorneys' fees, counsel for the IRS candidly acknowledged her agreement with the bankruptcy judge when she concluded her argument by saying, "I don't think that – you know, I think that the Court was correct that this was a close call. It was a credibility determination here." (Doc. 1-4 at 14 in Case No. 8:11-cv-2804-T-23, Middle District of Florida).